UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
UNITED STATES OF AMERICA       )
                              )
        v.                     )  CRIMINAL NO. 05-10262-PBS
                              )
SOPHOAN OUNG, et al.,          )
             Defendants.       )
_____)
```

**ORDER**

April 19, 2007

Saris, U.S.D.J.

Defendants, charged with drug trafficking and firearms offenses, move to suppress evidence seized at two residences in Lowell, Massachusetts on August 20, 2005 and statements made without <u>Miranda</u> warnings.  They have also brought a <u>Franks</u> motion based on alleged misrepresentations in a search warrant for one of the residences.  The witnesses were DEA Special Agent ("SA") Christian Brackett, the case agent; SA Paul Gazzara; Lowell Detective William J. Samaras; Larry Boggio, a resident of 30 Angle Street, Unit 40; Task Force Officer Daniel Rego; SA Young Jae Kim; and Lowell Police Officer James Fay.  The defense submitted affidavits from Hershey's girlfriend, Yessenia Abreu; Sophoan Oung's wife, Soda Loy; and his brother Sophanara Oung. After a six-day evidentiary hearing,[1] the motion is **ALLOWED IN PART** and **DENIED IN PART**.

**FINDINGS OF FACT**

---

[1] The hearings took place on 11/21/06, 1/3/07, 1/5/07, 1/8/07, 1/10/07 and 1/11/07.

A.   **Early Investigation**

The investigation began in 2005 with a phone call from a Lowell police officer to the DEA asking for help in the investigation of a cocaine trafficking ring in the Lowell area. The suspects were Sophoan Oung ("Hershey") and his brother Sophanara Oung ("Bee").  The DEA orchestrated six controlled purchases of cocaine in the Spring of 2005.  The first was with Hershey.  Later, an undercover agent contacted Bee via cell phone and set up the other buys.  The federal court authorized a wiretap on Hershey's cell phone on July 25, 2005 and on Bee's cell phone three weeks later, on August 16.  Defendant Phan Moul ("Magee") also used these phones.

Based on information from the wire, the agents learned that the stash house for street-level sales was 1311 Middlesex Street, called "Clubby One".  After further investigation, on August 9, 2005 the agents learned that another stash location known as "Clubby Two" was located at 30 Angle Street, a townhouse complex with fifty-two units around a courtyard, near the Lowell Registry of Motor Vehicles.  The agents suspected this location was used to store larger quantities of drugs.

In early August, SA Gazzara followed Magee in his Nissan Maxima and saw him park in the Registry parking lot adjacent to 30 Angle Street, enter the complex through a hole in the fence, and walk to either Unit 36 or 37.  He also saw Bee with a green Nissan Maxima and Hershey with a Ford Explorer in the parking lot.  Through binoculars, Gazzara observed the defendants enter

one of the apartments.  He couldn't figure out from the distance
at which he was observing (approximately 125 yards) which unit
was "Clubby Two" because both shared a back porch and their rear
doors were located close to one another.  One (#37) was
registered to Yessenia Abreu and had children's toys on the back
porch and curtains on the window, and the other (#36) was listed
as belonging to an Alves.  It had no curtains or children's toys.
Neither person was known to the government.  Based on
surveillance, the police did not know if the men were going to
Unit 36 or 37.  However, they suspected (as it turns out,
incorrectly) that Unit 36 was the stash because the other
location had children's toys.

When the investigation began in February 2005, Bee and
Hershey lived at 26 Hillside Street, Apartment One in Lowell.
They later moved to the second floor of 109 Forest Street, a two-
family home, where they lived with Hershey's wife and two
children.

On August 17, 2005, Bee left Clubby Two and told Hershey on
the wiretapped cell phone that he was going home (to Forest
Street) to get his "gat".  Hershey told him to get his gun too
from under the bed.  Hershey then called someone named Peter Song
to procure .380 bullets, preferably hollow tip.  Next, Hershey
called his wife and told her to keep their children out of the
bedroom because Bee had left a gun on the bed.  Bee then returned
to Clubby Two.  There had been earlier intercepted conversations
about guns (like a Mac-11 submachine gun) between Hershey and

3

Magee.  A confidential informant had also told police that
Hershey and Bee were in possession of an AK-47 assault rifle.

Over the wire, the DEA learned that Hershey would soon
receive a "package" from a supplier, later identified as Guber
Quezada (also known as Andre, and nicknamed "Dre").  At
approximately 9:27 p.m. on August 20, a Saturday, Hershey called
Bee and instructed him to get $9,700 in cash from the apartment
at 109 Forest for the meet with Dre.  Police observed Bee leave
Clubby One and drive to 109 Forest.  After a few minutes, he left
and returned to Clubby One.  Approximately 20 minutes later, a
Hispanic male arrived and entered Clubby One.  At the same time,
police intercepted a call to Hershey's phone from the supplier
asking Hershey where he was.  Hershey replied that his brother
(Bee) was there and that Bee would handle things.  After a few
minutes, Quezada left the house and drove away.  The police
believed he had delivered a "package" of cocaine.

Agent Brackett and others followed Quezada for a few miles
in an unmarked car.  The agents had arranged for local police to
perform a "wall off", a maneuver in which Quezada would be pulled
over, in the guise of a routine traffic stop, so that police
could learn his identity without alerting him to the
investigation.  When Quezada was observed speeding, a local
cruiser made the stop.  Quezada consented to a search of his
vehicle, and police discovered the $9,700, which was confiscated
along with his cell phone.  The police initially intended to
release Quezada.  However, Quezada was driving on a suspended

license and had outstanding warrants for motor vehicle
violations.  Quezada was arrested by local police and taken to
the Lowell Police Department.

At 10:05 police intercepted another call between Hershey and
Bee.  Bee told Hershey that he had met "Dre," had the "stuff,"
and that "the shit was good, but not beige or anything."  They
talked about the money.  Hershey then instructed Bee to "get it
out of there," and bring the package to Clubby Two.  At
approximately 10:20, Agent Brackett observed Bee leave Clubby One
and place a white plastic bag in the trunk of his car.  Bee drove
away towards 30 Angle Street, and Agents Brackett and Gazzara
tailed him at a distance.  The agents wanted to have a marked
Lowell cruiser execute another "wall off" maneuver, but due to
the large festival in Lowell that night they could not procure a
marked cruiser in time.

**B.   <u>Angle Street Search</u>**

While Bee was driving towards 30 Angle Street, he began
driving erratically.  Bee called Hershey and told him that he
suspected a car was following him.  When officers in the wire
room relayed this information to Agents Brackett and Gazzara,
they backed off.  The agents proceeded to 30 Angle Street by
another route, expecting that Bee would arrive before them.  Over
the wire, the police overheard Bee telling Hershey to open the
garage door.  The units at 30 Angle Street complex had garage
doors.

At 10:37, Hershey placed a call to Magee, telling him that

Bee had been followed and instructing him to "get everything out of the house, even the plug" (gun).  At 10:49, another conversation occurred.  They talked about the tail, and McGee told Hershey that he had "dropped everything off," and would change phones, cars, and "cut off" certain people.  They agreed to meet the next day to sort things out.  At this point, the agents decided to intervene and arrest the defendants immediately.  This was an unanticipated event.  Because the police had information that the suspects had several guns, including the AK-47, Mac-11 and hollow point ammunition, they decided to wait for backup.  A request was made for additional marked units and officers with rifles, but due to the festival that night it took approximately thirty minutes to muster enough officers.

By 11:25, the police were massed outside Units 36 and 37, still unsure which was Clubby Two.  Because of the children's furniture on the porch at Unit 37 and other decorations suggesting "a woman's touch," they suspected Unit 36.  Moreover, lights were on inside the garage at Unit 36, but not 37.  The agents knocked and announced their presence at Unit 36, and then forced their way in without a warrant.  They saw a man they didn't recognize coming down the stairs from the second floor.  Around this same time, the agents received information from the wire room that a woman was telling Hershey that police had just raided a neighbor's home.  The agents left Unit 36 within minutes, realizing they'd entered the wrong apartment.

At 11:38, as police were leaving the unit, two calls were intercepted between Hershey and Yessenia Abreu.  Abreu, audibly nervous, told Hershey that the police were "all over" the neighbor's house and outside her apartment.  Hershey replied, "just go to the kid's room."  Meanwhile, Agent Brackett approached two individuals sitting outside of Unit 40.  He showed them a photo of Hershey, and they indicated that he lived in Unit 37 and drove a dark colored Nissan maxima.  Agent Bracket used a flashlight to look through a window into the garage at Unit 37 and observed a dark green Nissan Maxima with tinted windows.  This was consistent with the car Agent Gazzara had seen Bee driving earlier in the month.  Detective Samaras had to lift Agent Brackett so that he could see into the window, but both were standing in a public area at the time.

Around 11:45 another call was intercepted.  Hershey asked Abreu to hide the drugs, but she responded that she couldn't because she was too scared.  Police monitoring the wire relayed to agents at the scene that Hershey and the occupant were discussing hiding or getting rid of the drugs, and the agents forcibly entered Unit 37 without a warrant.[2]

Inside Unit 37, agents questioned Abreu about Hershey's whereabouts.  She refused to answer, saying only that she was his girlfriend and that they'd met at work.  She did not consent to a

[2]Officers monitoring the wire at another location did not transmit the exact language used in the intercepted calls to the agents at the scene; instead, they passed along rough summaries of their content.

search of the apartment at this time.  The agents performed a protective sweep of the house to insure that no other individuals were present, but they did not search for contraband.  Bee was not in the apartment.  Eventually Abreu signed a waiver form consenting to the search.

### C.  **Forest Street Search**

Around midnight, agents at the scene were receiving updates from the wire room that Hershey was preparing to flee.  He was overheard telling McGee that Clubby Two "just got kicked in by police" and "we're all done . . . I'm getting out of here."  He said he was at "home," which the agents believed to be 109 Forest Street.  Agents Brackett, Gazzara and others proceeded to that location, which was only a few blocks away, in a matter of minutes.

When they arrived, the agents surrounded the house and secured the perimeter to prevent any escape from the apartment. They knocked and announced their presence.  SA Brackett threatened to break down the door unless the defendants gave themselves up (although there is some dispute as to whether Brackett actually made this threat).  Brackett peered through a window in the front door into the common hallway inside 109 Forest.  He saw two individuals standing on a landing at the top of the stairs leading up to the second floor apartment, just at the edge of his sight.  The individuals generally fit the profile of Bee and Hershey (Asian males of medium build).  Agent Brackett was concerned, from the intercepted conversations, that Hershey

and Bee were armed, and that there were guns in the apartment.
He was unsure whether other individuals were also inside.  Within
a few seconds of knocking, one of the individuals shouted down
from the landing that they were turning themselves in, and both
proceeded down the stairs with their hands raised.  The
individuals were Hershey and Bee.

Outside, on the porch, Agent Brackett placed Hershey and Bee
in handcuffs as soon as they exited the front door.  They were
arrested.  Brackett quickly asked them about guns while
conducting a pat frisk for weapons (he was unsure of the exact
language he used).  Hershey answered that the guns were in a
laundry basket at the top of the stairs to the second floor
apartment.  Brackett did not read Hershey and Bee their <u>Miranda</u>
rights prior to questioning them about weapons.

Without first obtaining a search warrant or consent from
Hershey or Bee, Agents Brackett and Gazzara entered through the
front door of 109 Forest Street and climbed the stairs to the
second floor apartment.  Agent Brackett went first.  He had his
gun drawn as he entered, but holstered it when he saw Hershey's
wife, Soda Loy, waiting in the doorway at the top of the stairs.
Agent Gazzara was unarmed, since he had forgotten his gun at home
that evening.

Agent Gazzara went into the apartment and retrieved a loaded
.44 caliber revolver and a loaded .380 semiautomatic pistol from
a laundry basket just inside the front door.  The guns were
hidden underneath some clothing.  Brackett then spoke to Loy.

9

Loy orally consented to a search of the apartment, but did not
sign a consent-to-search form.  (Loy submitted an affidavit
denying that she gave consent, but did not testify at the
hearing.)  As he was speaking to her, Agent Brackett saw a small
bag of marijuana on a table inside the apartment.  The marijuana
was never charged.  A small amount of cocaine consistent with
personal use was also found in a drawer.  The agents then
conducted a "cursory" (approximately five minutes) and partial
search of the premises, finding, in addition to the drugs, a box
of ammunition in Hershey's room concealed in a zippered bag of
clothes.

At 12:08, the police intercepted a call between McGee and
his sister.  McGee instructed her to get rid of "everything" in
the house.  At 12:10, the sister called McGee to confirm that
she'd done as he asked.  McGee talked about going to California.
At this point, certain officers left 109 Forest Street to find
McGee.

Agent Brackett returned to the Lowell Police Department to
prepare an affidavit in order to obtain a search warrant for 30
Angle Street.[3]  Detective William Samaras was the affiant, but
Brackett was responsible for drafting the affidavit.  Large
portions were copied from the draft affidavit they had intended
to use to reup the warrants on the wiretap.  Agent Brackett

---

[3]Agent Brackett testified that he did not attempt to procure
a warrant for 109 Forest Street, since he believed that the drugs
were stored in the two stash houses.

testified that he requested the "line sheet" for the calls
intercepted over the wire that evening from the Lowell police, in
order to add that information to the affidavit.  A "line sheet"
contains a brief summary of the content of phone calls, but does
not include a transcript.  Due to problems with a police printer,
however, Brackett was forced to go over the calls one-by-one with
another officer over the phone.

Agent Brackett did not include every piece of evidence
gathered against Hershey and Bee in the affidavit (such as the
entrance into Unit 36 or the fact that he had seen Hershey's car
in the garage at Unit 37), believing, he testified, that more
than sufficient probable cause existed for the warrant to issue.
He further averred that no potentially exculpatory information
was intentionally withheld from the affidavit.  However, certain
inconsistencies were contained in the document, such as incorrect
references to Unit 36 as the location of the Clubby Two.
(Compare Samaras Aff. ¶ 67, with id. ¶ 71.)  Agent Brackett
testified that this came about as a result of the inclusion of
the information copied from the existing wiretap affidavit
drafted while the agents were still unsure of the precise
location of Clubby Two.  He further stated that he had been awake
since 6 a.m. Saturday morning, and was exhausted by early Sunday
when he was preparing the affidavit.  He testified that he had
specifically told Officer Kim of the Lowell Police Department not
to rely on the written consent given by Yessenia Abreu to search
Clubby Two, but to wait for the warrant so that there would be no

legal problems with their search.   (Abreu denies she consented.)
I find that Brackett testified credibly.

Early the next morning the agents obtained a warrant from a
state magistrate.  Additional evidence -- including a kilo of
cocaine, approximately eighty grams of crack cocaine, a loaded
Beretta 9mm and a loaded .380 caliber semiautomatic handgun, and
other evidence of cocaine distribution -- was found during the
search of 30 Angle Street.  Additional evidence of trafficking
was found at other locations.

Defendants now move to suppress evidence obtained during the
search of 109 Forest Street and 30 Angle Street, challenging the
agents' warrantless entry into both locations.[4]  Defendants have
also moved for relief under <u>Franks v. Delaware</u>, 438 U.S. 154
(1978), asserting that certain inaccuracies and omissions in the
affidavit used to obtain a search warrant for 30 Angle Street
vitiated probable cause and rendered the search warrant invalid.

D.   <u>**30 Angle Street**</u>

a.   **The <u>Franks</u> Motion**

On September 26, 2006 this Court granted defendants' request
for a <u>Frank</u>'s hearing to challenge the integrity of the affidavit

---

[4]At the hearing on 1/5/07, the Court determined that Hershey
and Bee had standing to contest the search of 109 Forest Street
because both men resided at that location.  The Court ruled that
Hershey alone had standing to challenge the search of 30 Angle
Street because his name was on the lease and certain bills, and
there was evidence that he frequently slept there.  However, Bee
and the other defendants lack standing to contest the search of
Unit 37.

supporting the search warrant for 30 Angle Street. (See Docket
Entry, 9/26/2006.)  Defendants argue that the affidavit contained
false and misleading statements which were necessary to the
magistrate's determination of probable cause.  Specifically, they
contend that the affiant failed to disclose the initial confusion
regarding the precise location of "Clubby Two" within the complex
at 30 Angle Street and improperly concealed the fact that police
raided the wrong residence (Unit 36).[5]  The motion also
identified inconsistencies in the affidavit, such as mistaken
references to Unit 36 as the target apartment.  When the
affidavit stated that probable cause to search Unit 37 was "based
upon the above facts contained in the affidavit," defendants
contend, Bracket made a false and misleading statement because,
in fact, probable cause arose only when agents had eliminated
Unit 36 as a possible stash location, a fact omitted from the
affidavit.

Under Franks, in order for a warrant to be voided and the
fruits of the search excluded, the defendant must meet an
"exacting standard":

---

[5]Defendants argued that the agents also entered Unit 40
before deciding on Unit 37.  However, Larry Boggio, the owner of
Unit 40, testified that the police did not enter or attempt to
enter his home that evening.  The evidence produced by the
defendants on this point was weak, consisting of a mark on the
door to that apartment that defendants argued was consistent with
forced entry.  However, a photograph revealed that the mark on
the door to Unit 40 was in fact unlike the type of damage
inflicted by the sort of battering ram used by the agents.  I
find that the agents did not attempt to enter Unit 40.

he must (1) show that the affiant in fact made a false
statement knowingly and intentionally, or with reckless
disregard for the truth, (2) make this showing by a
preponderance of the evidence, and (3) show in addition
that 'with the affidavit's false material set to one
side, the affidavit's remaining content is insufficient
to establish probable cause.'

United States v. Tzannos, 460 F.3d 128, 136 (1st Cir. 2006)
(quoting Franks, 438 U.S. at 156).  The burden rests with the
defendant to overcome "the presumption of validity with respect
to the affidavit supporting the search warrant."  Id. (citing
Franks, 438 U.S. at 171.)

Hershey has fallen far short of his burden under Franks as
to all three elements.  The evidence does not support the
inference that Agent Brackett intentionally lied or acted
recklessly in procuring the affidavit.  Any mistakes or
inconsistencies in the affidavit were credibly explained by Agent
Brackett by reference to the hurried circumstances of the
evening, the inclusion of written portions of an affidavit
drafted prior to that night, his exhaustion, and simple
typographical error.  See Tzannos, 460 F.3d at 136 ("'Allegations
of negligence or innocent mistake are insufficient.'" (quoting
Franks, 438 U.S. at 171)).

This conclusion as to Brackett's motives is reinforced by
the existence of ample probable cause even with the errors cited
by defendants removed from the affidavit.  Based on surveillance
and intercepted calls, the agents had reason to believe that
either Unit 36 or 37 was the "Clubby Two" referenced over the

14

wire.  The initial mistaken entry into Unit 36,[6] the

identification of Unit 37 as Hershey's home by the neighbors

outside Unit 40, and the discovery of the dark green Nissan in

the garage at Unit 37[7] -- the offending omissions cited by

defendants -- all shore up, rather than weaken, the agents' cause

to believe that Unit 37 was the stash.  Thus even if these

omissions were deliberate (and I find that they were not) the

warrant would survive.   See, e.g., United States v. Legault, 323

F. Supp. 2d 217, 226 (D. Mass. 2004) ("A reviewing court should

add any facts intentionally or recklessly omitted from the

affidavit and determine whether the new information, if included,

would have defeated the finding of probable cause." citing United

States v. Cole, 807 F.2d 262, 267-268 (1st Cir. 1986))).  Any

---

[6]Defendants characterize this entry as "illegal" in an attempt to explain why SA Bracket would be motivated to omit it from the affidavit, and why that omission would be improper under Franks.  As explained below, however, this entry was proper given the real and present risk that evidence would be lost.  As such, Brackett had no reason to lie, and his conduct cannot be fairly characterized as dishonest.

[7]I note that Agent Brackett's use of a flashlight to look into the garage did not constitute a search within the meaning of the Fourth Amendment.  See United States v. Dunn, 480 U.S. 294, 305 (1987) (explaining that "the officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of Fourth Amendment"); cf. Kyllo v. United States, 533 U.S. 27, 34 (2001) (drawing the line at "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,'" at least where "the technology in question is not in general public use" (citation omitted)).

errors or misleading statements occasioned by these omissions, such as the statement that probable cause was based on facts contained in the affidavit, do not undermine the agents' reasonable belief that Unit 37 was the likely location of the stash.  See, e.g., Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003) (explaining that "centrally, the mercurial phrase 'probable cause' means a reasonable likelihood" (citing Illinois v. Gates, 462 U.S. 213, 235 (1983))).

Because there is no indication that Agent Bracket acted improperly and, in any event, because ample probable cause existed with respect to Unit 37 to support the search warrant, defendant's motion to void the warrant under Franks is denied.

### b.  The Warrantless Entry

Defendants also move to suppress evidence obtained from 30 Angle Street, Unit 37, arguing that the forced entry was not justified by exigent circumstances, and that the evidence later seized must be excluded as poisoned fruit.  The government responds that the risk of destruction of evidence rendered the forced entry constitutionally permissible.

"Generally speaking, absent probable cause and exigent circumstances the Fourth Amendment bars warrantless, nonconsensual entries of private residences."  United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995) (citing United States v. Curzi, 867 F.2d 36, 41 (1st Cir. 1989)).  "Probable cause will be

16

found to have been present if the officers at the scene
collectively possessed reasonably trustworthy information
sufficient to warrant a prudent policeman in believing that a
criminal offense had been or was being committed." Id. (citation
omitted).

A "cognizable exigency must present a 'compelling necessity
for immediate action that would not brook the delay of obtaining
a warrant.'" Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st
Cir. 1995) (quoting United States v. Wilson, 36 F.3d 205, 209
(1st Cir. 1994)).

> Although exigency determinations invariably are
> fact-intensive, exigent circumstances commonly include:
> (1) 'hot pursuit' of a fleeing felon; (2) threatened
> destruction of evidence inside a residence before a
> warrant can be obtained; (3) a risk that the suspect may
> escape from the residence undetected; or (4) a threat,
> posed by a suspect, to the lives or safety of the public,
> the police officers, or to an occupant.

Tibolt, 72 F.3d at 969 (1st Cir. 1995) (citations, alterations
and internal quotation marks omitted).  In determining whether an
exigency exists, a court's "inquiry is limited to the objective
facts reasonably known to, or discoverable by, the officers at
the time of the search." Id. (citing Illinois v. Rodriguez, 497
U.S. 177, 186 (1990)).

Here, the agents had sufficient cause to suspect that drug
evidence they reasonably believed to be inside Clubby Two was
about to be destroyed or at least hidden.  The agents suspected -
- based on specific information obtained through surveillance,

the wiretap, and the seizure of cash from Quezada -- that Bee was
in possession of a large amount of cocaine and en route to Clubby
Two.  In the phone call intercepted at 10:49 on August 20th,
defendants Hershey and Bee made clear that they were aware that
they were being watched and intended to cover their tracks.
Given the likelihood that Hershey, Bee and their associates would
attempt to destroy evidence, exigent circumstances were present
and the agent's warrantless entry into Unit 36 was in good faith,
even though it later proved mistaken.[8]  But regardless of the
propriety of the entry into Unit 36, once the police figured out
that Unit 37 was the likely stash location and received
information from the wire room that Hershey and a female were
discussing hiding the drugs, they were fully justified in
entering Unit 37 for the limited purpose of ensuring that the
evidence was preserved.  There was an exigency presented by the
risk that evidence inside the apartment would be hidden or
destroyed if the police waited for a warrant to issue.
Accordingly, there was no Fourth Amendment violation.

Following entry, the officers appropriately limited their
search of Unit 37 to a protective sweep, and waited for a warrant
before undertaking a more detailed investigation of the premises
and actually discovering and securing the cocaine.  The sweep was
reasonable because the police did not know if Bee or another

---

[8]Of course, the defendants lack standing to challenge this
search.

associate was present and armed.  Defendant Hershey's motion to suppress the evidence seized from 30 Angle Street is denied.

**E.   109 Forest Street**

**a.  Warrantless Arrest**

Defendants further contend that their warrantless arrest outside of 109 Forest Street violated their Fourth Amendment rights.  "Generally, police may not enter a person's home to arrest that person without an arrest warrant," unless there are exigent circumstances or an occupant consents to the entry. E.g., United States v. Berkowitz, 927 F.2d 1376, 1385 (7th Cir. 1991) (citing, inter alia, Payton v. New York, 445 U.S. 573 (1980)).  However, there is no Fourth Amendment violation if a suspect surrenders to the police; "'there is nothing in Payton that prohibits a person from surrendering to police at his doorway.'"  McClish v. Nugent, 2007 U.S. App. LEXIS 8294, 25-26 (11th Cir. 2007) (citation omitted).  Further, courts have generally upheld arrests "where the police go to a person's home without a warrant, knock on the door, announce from outside the home the person is under arrest when he opens the door to answer, and the person acquiesces to the arrest."  Berkowitz, 927 F.2d at 1386 (collecting cases).

I find that Hershey and Bee surrendered to the agents. Accordingly, their rights were not violated and the arrest was proper.

###### b.  The Public Safety Exception

Defendants also move to suppress statements and evidence seized from 109 Forest Street following their arrest.  They contend that once they had been arrested and placed in handcuffs, outside of their home, the agents violated their Fifth Amendment rights when the agents questioned them without <u>Miranda</u> warnings, and their Fourth Amendment rights when the agents entered their home without a warrant or consent.  The government, in turn, relies on the "public safety" exception to the Fourth and Fifth amendments to justify the agents' questions and subsequent seizure of evidence.

Generally, an individual must be informed of his <u>Miranda</u> rights prior to custodial interrogation.[9]  <u>E.g.</u>, <u>United States v. McCarty</u>, 475 F.3d 39, 45 (1st Cir. 2007) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)).  However, the Supreme Court has carved out a narrow exception to this rule, permitting officers to question suspects without <u>Miranda</u> warnings "in situations posing a threat to public safety." <u>New York v. Quarles</u>, 467 U.S. 649, 657 (1984).  The exception is cabined by the requirement that the questions relate "to an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." <u>Id.</u> at 659.  It allows officers "to

---

[9]Here, the parties do not dispute that Hershey and Bee, when placed under arrest on their porch, were subject to custodial interrogation.

follow their legitimate instincts when confronting situations presenting a danger to the public safety," id., because, in such situations, "spontaneity" is "necessarily the order of the day." Id. at 656; see, e.g., United States v. Reyes, 353 F.3d 148, 152-53 (2d Cir. 2003).

In Quarles, a woman told police she had just been raped at gunpoint. Quarles, 467 U.S. at 652. The police pursued the suspect into a crowded supermarket, where he was apprehended wearing an empty shoulder holster. Id. After placing him in handcuffs, an officer questioned the suspect about the location of the missing gun without first informing him of his Miranda rights. Id. When the suspect answered that it was hidden in an empty carton in the market, the officers retrieved the gun. Id. In holding that Miranda did not require suppression of the statements or the weapon, the Court stated that an officer's "need for answers to questions in a situation posing a threat to the public safety outweighs the need for a prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 658. The court explained:

> The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holder and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than a danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.
> In such a situation, if the police are required to

recite the familiar <u>Miranda</u> warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding.

<u>Id.</u>  "The exception to <u>Miranda</u> also applies where there is a threat to the officers rather than the public." <u>United States v. Newsome</u>, 475 F.3d 1221, 1225 (11th Cir. 2007) (citing <u>Quarles</u>, 467 U.S. at 659); <u>see, e.g.</u>, <u>United States v. Lackey</u>, 334 F.3d 1224, 1228 (10th Cir. 2003) ("The exception undoubtably extends to officers' 'questions necessary to secure their own safety.'" (citations omitted)).

Three principles guide courts in this inquiry.  <u>See United States v. Estrada</u>, 430 F.3d 606, 612 (2d Cir. 2005).  First, "<u>Miranda</u> warnings need not precede questions reasonably prompted by a concern for the public safety or for the safety of arresting officers so long as the questioning relates to an *objectively* reasonable need to protect the police or the public from any immediate danger."  <u>Id.</u> (citations and internal quotation marks omitted); <u>see also</u> <u>United States v. Fox</u>, 393 F.3d 52, 60 (1st Cir. 2004), <u>vac'd on other grounds</u>, 545 U.S. 1125 (2005).

Second, "the exception is limited by the fact that pre-<u>Miranda</u> questions, while framed spontaneously in dangerous situations, may not be investigatory in nature or designed solely to elicit testimonial evidence from a suspect."  <u>Estrada</u>, 430 F.3d at 612 (citations and internal quotation marks omitted); <u>see also</u> <u>Fox</u>, 393 F.3d at 60.  Of course, "[a]n officer is not

22

expected to craft a perfect question in the heat of the moment."
Newsome, 475 F.3d at 1225.  "Thus, a question that plainly
encompasses safety concerns, but is broad enough to elicit other
information, does not necessarily prevent application of the
public safety exception when safety is at issue and context makes
clear that the question primarily involves public safety."
Estrada, 430 F.3d at 612.

Finally, the exception should not be read to permit pre-
Miranda questioning "as a routine matter"; rather, given the
flexibility required in potentially dangerous situations, the
exception has been described as "a function of the facts of cases
so various that no template is likely to produce sounder results
than examining the totality of the circumstances in a given
case." Id. (citations and quotation marks omitted).  In essence,
this final consideration is an examination of the reasonableness
of the officers' actions in light of the "significance of
exigency revealed by circumstances known to the officers"
involved.  Cf. United States v. Banks, 540 U.S. 31, 37 (2003).

If a court determines that the Quarles exception applies,
both "a defendant's statement -- and the physical evidence
recovered as a result of that statement -- may be admitted into
evidence at trial."  Estrada, 430 F.3d at 610; see Newsome, 475
F.3d at 1225 ("It would defy common sense to allow the officers
to question [a defendant] as to whether there was any threat and
then prevent them from neutralizing that threat.").  This is true

even if the resulting seizure would otherwise violate the Fourth
Amendment: "Quarles holds that the warrantless seizure of a gun
is 'objectively reasonable' under the Fourth Amendment when there
is a real concern for the safety of the officers present or the
public at large."  Newsome, 475 F.3d at 1225 (quoting Quarles,
467 U.S. at 653 n.3); see United States v. Antwine, 873 F.2d
1144, 1147 (8th Cir. 1989) ("The clear implication of Quarles is
that a warrantless seizure of a weapon may be considered
'reasonable' within the meaning of the Fourth Amendment when
justified by an officer's legitimate concern for someone's
safety.").  However, the scope of any search resulting from
statements elicited under the "public safety" exception must not
exceed "what was necessitated by the exigency."  Antwine, 873
F.2d at 1147.

     Turning to the facts of this case, the agents' pre-Miranda
questions and subsequent seizure of weapons from 109 Forest
Street were justified by reasonable concerns for their own
safety.  First, the questions posed by agent Brackett stemmed
from an objectively reasonable apprehension of danger.  The
agents had specific information that the defendants were in
possession of a veritable arsenal of weaponry, including an AK-47
assault rifle, a Mac-11 submachine gun, and hollow point
ammunition.  The defendants had been overheard speaking about
guns just three days earlier, on August 17.  As such, the agents'
questions were "reasonably prompted by a concern" for their

safety.  Quarles, 467 U.S. at 656; cf. United States v. Holt, 264
F.3d 1215, 1221-26 (10th Cir. 2001)(en banc) (generalized
concerns about officer safety justify routinely asking about
possession of weapons during traffic stops).  This concern for
safety did not subside simply because the defendants were in
custody at the time they were questions.  See, e.g., Fox, 393
F.3d at 56-57 (when officer discovered a shotgun shell on a
defendant's person after a routine traffic stop, he was permitted
to question the defendant about the location of the shotgun under
Quarles even though the defendant was in custody at the time);
United States v. Edwards, 885 F.2d 377, 385 & n.4 (7th Cir. 1989)
(upholding questioning of suspected drug dealer as to whether he
was armed because "drug dealers are known to arm themselves" and
the officers had an "objectively reasonable need" to protect
themselves "from the immediate danger that a weapon would pose,"
even though the suspects had already been handcuffed and
frisked), vac'd on other grounds, United States v. Romero, 131
Fed. Appx. 491 (7th Cir. 2005) (unpublished opinion).  The agents
did not know who else was in the apartment.  Given the threat
posed by the possibility that an armed co-conspirator was hiding
in the apartment above, or outside the door, the agents were
permitted to inquire about the location of the weapons.[10]

---

[10] Alternatively, the agents actions were justified by the
danger the guns posed to others.  The agents had specific
information from intercepted calls that guns were kept at 109

Second, while the agents were unable to identify precisely the question asked of defendants, multiple agents testified that the question was generally "about" guns and where they were located.  The answer elicited -- that the guns were in a laundry basket at the top of the stairs -- substantiates that the agents' questions were not investigatory in nature or crafted to elicit a testimonial response.  The questions were therefore tailored to address the danger at hand, and consistent with those permitted under <u>Quarles</u>.

Finally, the totality of circumstances in this case supports the conclusion that the application of the "public safety" doctrine in this case will not transform the exception into the rule.  Hershey and Bee were known drug traffickers who had been observed over the course of several months.  The agents reasonably believed they were armed and dangerous.  The chaotic sequence of events that evening, including the agents' trip to 109 Forest and the warrantless arrest of the defendants, were precipitated by unforeseen events -- the defendants found out the cops were on to them.  As a result, this is not a case where officers were taking advantage of a manufactured exigency to

---

Forest Street.  They knew that children lived in the home and that on at least one occasion a gun had been left lying on a bed, accessible to the children.  <u>See</u> <u>Antwine</u>, 873 F.2d at 1147 (upholding warrantless entry under <u>Quarles</u> where agent, who had already placed suspect into custody, knew that a gun was in the suspect's home and believed that the weapon posed a threat to the suspect's children still inside the home).

avoid their constitutional obligations.  Instead, the agents'
actions were a reasonable response to a rushed and chaotic
situation, where they faced the potential destruction of
evidence, risk of flight, and the ever-present threat of violence
from defendants.  When questioned as to why he asked about and
then retrieved the guns, Agent Brackett credibly testified that
it "seemed like the right thing to do."  The agents' questions
did not violate the defendants' Fifth Amendment rights.

Therefore, because the agents' questioning did not violate
the defendants' Fifth Amendment rights, their seizure of the
weapons from 109 Forest did not violate the Fourth Amendment.
See Quarles, 467 U.S. at 653 n.3.  That seizure, however,
required only that the agents proceed to the top of the stairs at
109 Forest Street, just across the threshold to the apartment,
where the laundry basket was located.  At that point, once the
guns were secured, the exigency was over and the agents' had no
right to search the premises further.

Nonetheless, the agents continued their search, purportedly
on the basis of consent given by Hershey's wife, Soda Loy.  This
search uncovered the ammunition in Hershey's room.[11]  Loy

---

[11]The agents also testified that a small amount of marijuana
was in plain view on a table inside the apartment, and that on
closer inspection a small amount of cocaine was found in a
drawer.  Or, they testified, it was the other way around, and the
cocaine was visible on the table and the marijuana was in the
drawer.  The marijuana was never charged and is therefore
irrelevant to this motion to suppress.  It is unclear if the
cocaine is aggregated in the total drug amount charged.  In any

submitted an affidavit denying that she gave consent, but failed to appear at the hearing on this motion. For that reason, I will not credit her denial. However, on the facts presented here, even if Loy did consent to a search of her apartment, it is not apparent that her consent was voluntary within the lines drawn by this circuit.

The government bears the burden of demonstrating, by a preponderance of evidence, that consent was validly obtained. United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). "This entails a showing that an appropriate person voluntarily gave a valid consent. Typically, whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances." United States v. Romain, 393 F.3d 63, 69 (1st Cir. 2004). This circuit has distinguished voluntary consent from "simple acquiescence to what any reasonable person would have perceived, under the circumstances, as police conduct tantamount to a claim of lawful authority to search." United States v. Weidul, 325 F.3d 50, 54 (1st Cir. 2003); see also Florida v. Bostick, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a

---

event, the testimony on this point failed to establish whether drugs were in fact in plain view from the doorway, or whether the agents saw the drugs in the course of their search of the apartment. The cocaine is suppressed.

request that they would prefer to refuse."); United States v.
Gunning, 405 F. Supp. 2d 79, 82 (D. Mass. 2005) ("Consent is not
freely given if a reasonable person would have believed that his
consent was required by investigating officers." (citation
omitted)).

While I find that the agents' actions did not rise to the
level of intimidation or harassment, the circumstances under
which Loy's consent was obtained were sufficient to overwhelm the
will of an ordinary person to refuse.  Loy agreed to the search
(apparently) only after agents had already entered her apartment,
one with a gun drawn, seized guns from the laundry basket without
consent and arrested her husband and brother-in-law.  Given these
facts, and because the government concedes that written consent
was not obtained, I find that the government has not demonstrated
Loy's oral consent was voluntary.  Accordingly, the search of 109
Forest Street following seizure of the guns was in violation of
the Fourth Amendment and the bullets seized in Hershey's bedroom
are therefore excluded.

### ORDER

For the reasons states, defendants' Franks motion (Docket
No. 81) is **DENIED**; defendant Hershey's motion to suppress
evidence obtained from 30 Angle Street (Docket No. 83) is **DENIED**.
Defendants motion to suppress evidence obtained from 109 Forest
Street (Docket No. 84) is **ALLOWED** as to the ammunition and

cocaine, but **DENIED** as to all other evidence.

/s/ Patti B. Saris

_____
PATTI B. SARIS
UNITED STATES DISTRICT JUDGE